MONIQUE C. WINKLER (Cal. Bar No. 213031)
JASON H. LEE (Cal. Bar No. 253140)
JOHN K. HAN (Cal. Bar No. 208086)
  hanjo@sec.gov
MATTHEW G. MEYERHOFER (Cal. Bar No. 268559)
  meyerhoferm@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 700
San Francisco, CA 94104
(415) 705-2500 (Telephone)
(415) 705-2501 (Facsimile)

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

   vs.

BABA NADIMPALLI,

      Defendant.

Case No.

COMPLAINT

Plaintiff Securities and Exchange Commission (the "SEC") alleges:

### SUMMARY OF THE ACTION

1.      From at least January 2021 through February 2022, Baba Nadimpalli ("Nadimpalli" or "Defendant") engaged in a fraudulent scheme to raise more than $30 million from investors by falsely inflating the commercial success of SKAEL, Inc., a software business Nadimpalli co-founded in 2016 and ran as its CEO until July 2022. Nadimpalli lied to prospective SKAEL investors by telling them that SKAEL ended 2020 with more than $2 million in "annual recurring revenue" ("ARR"), an important metric for its current and future success, and that it ended 2021 with $7 million in ARR. Nadimpalli also provided prospective investors with offering

materials suggesting that SKAEL's customers included public companies and well-known brands at a time when none of those companies had a commercial relationship with SKAEL. To help perpetuate this fraud, Nadimpalli provided a SKAEL finance employee and at least one investor with fake bank statement information that purported to show millions of dollars in nonexistent payments to SKAEL from customers.

2.     Nadimpalli also misappropriated hundreds of thousands of dollars of investor funds. He used at least $270,000 of money raised from SKAEL investors to pay for personal expenses like mortgage payments, home renovations, and car payments.

3.     In May 2022, Nadimpalli admitted to certain SKAEL investors that, contrary to what he had told them previously, SKAEL did not have more than $7 million in ARR. SKAEL's Board of Directors convened a Special Committee to conduct an internal investigation into the matter. Before the investigation concluded, Nadimpalli and the other members of SKAEL's Board of Directors voted to wind down the company. Nadimpalli subsequently left the United States.

4.     As a result of the conduct alleged in this complaint, Defendant violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)].

5.     In this action, the SEC seeks: permanent injunctions; disgorgement of ill-gotten gains with prejudgment interest; and civil monetary penalties. The SEC also seeks an order prohibiting Defendant from participating in the issuance, purchase, offer, or sale of any securities, and imposing an officer and director bar against Defendant.

**JURISDICTION AND VENUE**

6.     The SEC brings this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)], and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

7.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a)], and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

8.      Defendant, directly or indirectly, made use of the means and instrumentalities of interstate commerce or of the mails in connection with the acts, transactions, practices, and courses of business alleged in this complaint.

9.      Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)]. Acts, transactions, practices, and courses of business that form the basis for the violations alleged in this complaint occurred in this District. For example, SKAEL's principal place of business at all relevant times was in San Francisco, California.

10.      Under Civil Local Rule 3-2(d), this civil action should be assigned to the San Francisco Division because a substantial part of the events and omissions which give rise to the claims alleged herein occurred in San Francisco County.

## DEFENDANT

11.      **Baba Nadimpalli**, age 41, is an Australian citizen and is believed to be residing presently in Australia. He co-founded SKAEL and was its CEO until July 2022.

## RELATED ENTITY

12.      **SKAEL, Inc.** was, at all relevant times, a Delaware corporation with its principal place of business in San Francisco, California. It was a private developer of business process automation software from its founding in 2016 until it suspended operations in July 2022.

## FACTUAL ALLEGATIONS

**A.      SKAEL Struggled to Build a Subscription-Based Business Process Automation Platform.**

13.      Nadimpalli and two co-founders created SKAEL in 2016 with the goal of creating subscription-based software modules, which the company called "digital employees," to perform routine business functions. Offloading routine tasks onto SKAEL's digital employees, which were supposed to operate via a simple chatbot interface, was intended to allow customers' actual, human employees to spend more time doing meaningful work and less time doing repetitive tasks.

14.      SKAEL entered into agreements with some prospective customers to develop a "proof of concept" for a digital employee. These proofs of concept were intended to show

1  prospective subscribers how digital employees worked and how SKAEL's software could be

2  adapted to subscribers' business needs. Prospective subscribers typically paid SKAEL a one-time

3  fee to develop a proof of concept. But most companies that paid for a proof of concept did not

4  become stable, long-term subscribers.

5  **B.      In Early 2021, Nadimpalli Raised $1 Million From an Investor by Lying About

6          SKAEL's Annual Recurring Revenue and Creating Fake Bank Statements.**

7          15.      On January 5, 2021, Nadimpalli sent a venture capital firm ("VC1") an email

8  stating that SKAEL had ended 2020 with $2.1 million in ARR. ARR is the amount of revenue that

9  a business, at a point in time, expects to realize over the next 12 months on the basis of existing

10  subscriptions and contractual agreements. Nadimpalli also told VC1 that SKAEL had ended 2019

11  with $300,000 in ARR, which implied that SKAEL's year-end 2020 ARR represented 600% in

12  year-over-year growth.

13          16.      This statement about 2020 ARR was false. Nadimpalli knew, or was reckless in not

14  knowing, that SKAEL did not actually end 2020 with $2.1 million in ARR. In reality, SKAEL

15  never had any more than $170,000 in ARR at any point from 2020 to 2022.

16          17.      VC1 considered ARR to be an important metric for evaluating potential

17  investments, and based on SKAEL's purported growth, VC1 offered to make an investment in

18  SKAEL. In the course of negotiating the investment, VC1 asked Nadimpalli to provide bank

19  statements supporting Nadimpalli's claims about SKAEL's ARR. In order to support his

20  fraudulent claims about SKAEL's ARR, on January 28 and February 1, 2021, Nadimpalli emailed

21  VC1 several months' worth of doctored bank statements, which showed hundreds of thousands of

22  dollars in nonexistent payments, many of them purportedly made by companies that were not

23  SKAEL customers. Nadimpalli knew, or was reckless in not knowing, that the bank statements he

24  provided to VC1 were fake.

25          18.      On February 2, 2021, after receiving the fake bank statements, VC1 paid SKAEL

26  $1 million for a Simple Agreement for Future Equity, or "SAFE." A SAFE is a type of derivative

27  security that converts into preferred stock upon the occurrence of triggering events specified in the

28  SAFE.

19.     Nadimpalli was SKAEL's primary contact with many potential and actual customers. He also was the only person at SKAEL who had access to the bank account that SKAEL used to receive payments from customers.

**C.      In Late 2021 and Early 2022, Nadimpalli Raised More Than $30 Million from Investors by Continuing to Lie About SKAEL's Annual Recurring Revenue and Giving Investors Misleading Offering Materials.**

20.     From at least August 2021 through February 2022, Nadimpalli solicited investments in SKAEL's "Series A" private offering. Throughout this period, Nadimpalli promoted SKAEL to prospective investors using written presentation materials, or "pitch decks," representing that SKAEL had ended 2020 with $2.3 million in ARR. An August 2021 version of this pitch deck represented that SKAEL's ARR at that time was $4.78 million, and later versions represented that SKAEL's ARR had increased to $7 million or more by the end of 2021. These representations were all false. As Nadimpalli knew, or was reckless in not knowing, SKAEL never had more than $170,000 in ARR at any point when it was selling securities in 2021 and 2022. Nadimpalli worked on drafts of these pitch decks and was the person from SKAEL who presented the decks at investor meetings.

21.     The pitch decks also contained a slide that purported to show the company logos of SKAEL's customers. As Nadimpalli knew, or was reckless in not knowing, that slide was misleading because it included the logos of several companies that were not SKAEL subscribers. Some of these companies had paid SKAEL for a proof of concept but had not become SKAEL subscribers, and others had never been SKAEL customers of any type at all.

22.     Nadimpalli also directed a SKAEL finance employee to create profit-and-loss statements to distribute to prospective SKAEL investors. Instead of providing the finance employee with direct access to the bank account where SKAEL received customer payments, Nadimpalli provided the finance employee with spreadsheets that Nadimpalli claimed showed transactions in the bank account. As Nadimpalli knew or was reckless in not knowing, these spreadsheets, like the doctored bank statements that Nadimpalli had provided to VC1, were fake and included millions of dollars in nonexistent customer payments. The finance employee relied

on these spreadsheets to create profit-and-loss statements, with the result that those statements inflated SKAEL's revenue and ARR by millions of dollars. SKAEL provided prospective investors with these fraudulent profit-and-loss statements.

23.     In late November or early December 2021, Nadimpalli presented the pitch deck described above to another venture capital firm ("VC2"). Nadimpalli falsely represented to VC2 that SKAEL's ARR at the end of 2021 was $7 million. Nadimpalli also gave VC2 a spreadsheet that purported to show a customer-by-customer breakdown of SKAEL's ARR as of November 2021. That spreadsheet falsely represented that SKAEL's ARR in November 2021 was more than $6 million; it also falsely ascribed more than $1 million in ARR to a particular SKAEL subscriber who, in reality, had a subscription worth only $60,000 per year. Nadimpalli knew, or was reckless in not knowing, that all of these representations about SKAEL's ARR were false. VC2 considered ARR to be an important metric for evaluating potential investments. On February 7, 2022, VC2 paid SKAEL more than $15.7 million for SKAEL preferred stock.

24.     In November 2021, Nadimpalli presented the August 2021 version of the pitch deck described above to a third venture capital firm ("VC3"). At that time, Nadimpalli also verbally claimed to VC3 that SKAEL's ARR was $6 million. In December 2021 or January 2022, Nadimpalli presented another version of the pitch deck to VC3, this one representing that SKAEL's ARR had grown to $7.2 million. Nadimpalli knew or was reckless in not knowing that these ARR numbers were false. VC3 considered ARR to be an important metric for evaluating potential investments. On December 16, 2021, VC3 paid SKAEL $1 million for a SAFE. On February 1, 2022, VC3 paid SKAEL an additional $7 million for SKAEL preferred stock.

25.     On a December 14, 2021 telephone call, Nadimpalli told VC1 that SKAEL was finishing 2021 with more than $7 million in ARR. Nadimpalli knew or was reckless in not knowing that this was false. On February 1, 2022, VC1 paid SKAEL more than $2.2 million for SKAEL preferred stock.

26.     In total, eight investors collectively paid SKAEL almost $30 million for preferred stock during SKAEL's Series A private offering (not including VC1 and VC3's $1 million SAFE investments). Among other things, investor money was used to pay Nadimpalli's salary at SKAEL.

**D.      Nadimpalli Misappropriated SKAEL Funds For Personal Expenses.**

27.      Before and after these investments, Nadimpalli had a practice of using one of SKAEL's bank accounts to pay for personal expenses. These payments amounted to hundreds of thousands of dollars and included mortgage payments on Nadimpalli's personal residence, home renovation payments, car payments, and payments on Nadimpalli's personal credit card. For example, from January 2018 through July 2022, Nadimpalli made a payment on his home mortgage about once a month from SKAEL's bank account, usually in the amount of $4,700. Nadimpalli did not tell investors that he used SKAEL's money to pay for personal expenses.

**E.      SKAEL Collapsed When the Company's Board of Directors Investigated its ARR Numbers.**

28.      On a May 20, 2022 call, Nadimpalli told representatives of VC3 that the $7 million ARR number he had shared during the Series A offering process was wrong, but misleadingly blamed the inaccuracy on SKAEL's sales personnel. SKAEL's Board of Directors formed a Special Committee to investigate the matter. While that investigation was ongoing, SKAEL's Board of Directors, including Nadimpalli himself, voted to wind down the company. Nadimpalli subsequently left the United States.

## FIRST CLAIM FOR RELIEF

*Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder*

29.      The SEC re-alleges and incorporates by reference Paragraph Nos. 1 through 28.

30.      Defendant, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of securities, by use of means or instrumentalities of interstate commerce, or of the mails, with scienter:

> a.   Employed devices, schemes, or artifices to defraud;
>
> b.   Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

1            c.   Engaged in acts, practices, or courses of business which operated or would

2                 operate as a fraud or deceit upon other persons, including purchasers of

3                 securities.

4      31.    By reason of the foregoing, Defendant violated, and unless restrained and enjoined

5  will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5

6  thereunder [17 C.F.R. § 240.10b-5].

7                        **SECOND CLAIM FOR RELIEF**

8                   *Violations of Section 17(a) of the Securities Act*

9      32.    The SEC re-alleges and incorporates by reference Paragraph Nos. 1 through 28.

10     33.    Defendant, by engaging in the conduct described above, directly or indirectly, in

11  the offer or sale of securities, by use of the means or instruments of transportation or

12  communication in interstate commerce or by use of the mails:

13            a.   with scienter, employed devices, schemes, or artifices to defraud;

14            b.   obtained money or property by means of untrue statements of material fact

15                 or by omitting to state a material fact necessary in order to make the

16                 statements made, in light of the circumstances under which they were

17                 made, not misleading; and

18            c.   engaged in transactions, practices, or courses of business which operated or

19                 would operate as a fraud or deceit upon purchasers.

20     34.    By reason of the foregoing, Defendant violated, and unless restrained and enjoined

21  will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

22                           **PRAYER FOR RELIEF**

23      WHEREFORE, the SEC respectfully requests that the Court:

24                                 **I.**

25      Permanently enjoin Defendant from directly or indirectly violating Section 10(b) of the

26  Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, and

27  Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

28

**II.**

Permanently enjoin Defendant from directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any securities, provided however, that such injunction shall not prevent Defendant from purchasing or selling securities for his own personal accounts.

**III.**

Enter an order prohibiting Defendant from serving as an officer or director of any issuer having a class of securities registered with the SEC pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

**IV.**

Issue an order requiring Defendant to disgorge all ill-gotten gains received as a result of his unlawful conduct plus prejudgment interest thereon pursuant to Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)].

**V.**

Issue an order requiring Defendant to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

**VI.**

Retain jurisdiction over this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VII.**

Grant such other and further relief as this Court may determine to be just, equitable, and necessary.

Dated:  September 24, 2024                    Respectfully submitted,

                                              */s/ Matthew Meyerhofer*
                                              Matthew Meyerhofer
                                              Attorney for Plaintiff
                                              SECURITIES AND EXCHANGE COMMISSION